## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MONTESQUIEU, INC., et al.,[1] | ) | Case No. 19-10599 (BLS) |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF FONDA HOPKINS IN SUPPORT OF FIRST DAY MOTIONS**

I, Fonda Hopkins, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the President and Chief Executive Officer of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").  I submit this declaration (the "Declaration") in support of the Debtors' petition and "first day" motions and pleadings, described further below (collectively, the "First Day Motions").  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting such documentation and other information.

2.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge,

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Montesquieu, Inc. (8069), WG Best Weinkellerei, Inc. dba Montesquieu Winery (California) (0458) and Montesquieu Corp. (California) (4025).  The headquarters and service address for the above-captioned Debtors is 8929 Aero Dr, San Diego, California 92123.

Active\90725689.v6-3/20/19

review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Part I of this Declaration describes the business of the Debtors, the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith in support of their chapter 11 cases. Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## PART II

## BACKGROUND

### A.    Description and History of the Debtors' Business

4.      The Debtors are Montesquieu, Inc., a Delaware corporation ("Holdings"), and its two wholly owned subsidiaries, WG Best Weinkellerei, Inc dba Montesquieu Winery, a California corporation ("WG Best"), and Montesquieu Corp., a California corporation ("Montesquieu Corp.").

5.      Headquartered in San Diego, California, the Debtors operate a unique direct to consumer wine business involved in sourcing, producing, bottling and selling high quality boutique wines directly to consumers via a bespoke portfolio of licenses that cannot be duplicated in today's market (which is dominated by the three-tier distribution system which otherwise excludes boutique wines from such system).  The Debtors partner with little known wineries (of which there are thousands) that otherwise face great difficultly accessing consumers to enjoy their wines.

*Montesquieu, Inc. ("Holdings")*

2

6.      Holdings is a Delaware holding company that was formed in 2011. Holdings' assets consist primarily of (i) the stock of its subsidiaries, and (ii) the trademarks, copyrights and other intellectual property that it licenses to WG Best and Montesquieu Corp.

7.      Holdings also owns 100% of the capital stock of Dynamo Sails Ltd. ("Dynamo"), a BVI Company, which was formed pursuant to the 2010 purchase of a 100-foot yacht (the "Spirit of the East") that was originally intended to be used to charter the Debtors' high net worth clients for wine cruises.

### WG Best Weinkellerei, Inc dba Montesquieu Winery ("WG Best")

8.      WG Best was founded in 1992.  WG Best is the main operating entity that purchases wines wholesale and ready to sell, crushes and bottles wine under its own labels, operates a warehouse and fulfillment center, and is responsible for the Debtors administration. WG Best conducts this comprehensive business activity pursuant to a portfolio of licenses across 38 states that provide the Debtors with the consolidated ability to import, export, wholesale and sell wine directly to consumers via the Sales team at Montesquieu Corp.

9.      WG Best outsources marketing and sales operations to its sister corporation, Montesquieu Corp.

10.      Excluding the debt service, operating, storage and maintenance costs associated with the Spirit of the East and Dynamo, WG Best operated profitably throughout the majority of its corporate history.

### Montesquieu Corp.

11.      Montesquieu Corp. was formed in 1995, and is the sister entity to WG Best. Montesquieu Corp. primarily is responsible for marketing and sales of wine.  Montesquieu Corp. operates at breakeven and is administratively segregated from WG Best due to interpretation of regulations associated with the Debtors' license portfolio.  The sales team that

3

operates the Montesquieu Corp. business is a strategic asset of the Debtors in that the training to become a successful wine salesman has a long lead time. As a result, the Debtors' sales team is long-tenured, which further enhances its value.

12.    On March 20, 2019 (the "Petition Date"), the Debtors commenced a reorganization proceeding under Chapter 11.

**B.    Prepetition Debt**

13.    *Prepetition Financing.*  Holdings and Fonda Hopkins, the President and Chief Executive Officer of the Debtors, are party to that certain Convertible Promissory Note, pursuant to which Holdings is indebted to Fonda Hopkins in the amount of $100,000. The Convertible Promissory Note provides that, upon the implementation of a plan of reorganization, the debt under the Convertible Promissory Note shall automatically convert in whole without any further action into shares of the Holdings' common stock.

14.    *Guaranty of Dynamo Sails Ltd. Debt.* In connection with Dynamo's financing of its purchase of the Spirit of the East, Dynamo entered into that certain Marine Note and Security Agreement dated January 26, 2010, in the principal amount of $1,600,000. WG Best and Montesquieu Corp. each entered into a separate Continuing and Unconditional Guaranty, dated January 26, 2010, each in the amount of $1,600,000. As of the Petition Date, the lender contends that there remains approximately $1,200,000 remaining outstanding on the Spirit of the East debt. The parties are in arbitration regarding the debt.

15.    *Hard Money Financing.*  WG Best and Forward Financing LLC are party to that certain Future Receipts Sale Agreement, dated August 31, 2018.[2] Under the Future

---

[2] The Debtors do not concede that the Future Receipts Sale Agreement is, in substance, a sale of receivables and not a financing agreement, and reserve all rights and remedies with respect to the Future Receipts Sale Agreement.

Receipts Sale Agreement, WG Best received from Forward Financing LLC $165,000. In exchange, WG Best is required to repay Forward Financing LLC $237,600. WG Best believes that, as of the Petition Date, approximately $62,000.00 remains outstanding under the Future Receipts Sale Agreement.

16.      *Trade and Other Unsecured Debt*. The aggregate trade and other unsecured debt of the Debtors is approximately $3,500,000.

**C.**      **Debtors' Employees**

17.      Rather than employ its staff directly, the Debtors contract with ADP as a professional employer organization (a "PEO"). Although the Debtors direct the employees in the performance of their duties, ADP employs them. ADP provides services and benefits such as payroll processing, employer payroll tax filing, workers' compensation insurance, health benefits, employers' practice and liability insurance, retirement plans, and other related programs.

18.      Using a PEO provides the Debtors with great flexibility and permits it to focus on its core operations. On a weekly basis, the Debtors are required to reimburse ADP for the costs of payroll and benefits, as well as fees the Debtors are required to pay ADP in its capacity as a PEO.

**D.**      **Events Leading to the Bankruptcy Filing and Commencement of the Chapter 11 Case**

19.      Subsequent to the capital acquisition of the Spirit of the East, the Debtors began to devote a significant amount of working capital, operating profit, and management attention toward the debt service, operation, storage, and maintenance associated with the Spirit of the East and Dynamo.  Additionally, the wine cruises contemplated at the time of the

acquisition of the Spirit of the East never commenced, furthering the deterioration of operating profits and working capital in favor of a non-revenue producing asset.

20.    In response to the cash drained from working capital, the Debtors began to reduce wine inventory levels, purchases of, and commitments to wine acquisition.  With less wine to sell, some members of the sales team voluntarily resigned and/or were recruited away by the Debtors' competitors.  Considering the cost and lead time to qualify and train replacement sales team members, the Debtors often forewent replacement of such individuals. As a result, the client relationships and related sales were lost, and the Debtors' revenues decreased.

21.    As revenues decreased, the pressure on operating profit and working capital increased until there was not enough to continue to service the debt, maintenance, operation, and storage of the Spirit of the East. In late 2018, the U.S. Marshals Service arrested the Spirit of the East.

22.    Meanwhile, the Debtors experienced an ongoing and worsening liquidity crisis in the operating business, and downsized it as rapidly as possible.  Toward the end of 2018, the Debtors reached operational breakeven at the annual sales level of approximately 120,000 bottles achieved in 2017 and 2018. However, losses created by the imbalance had to be funded, in addition to inventory purchases.

23.    Funding such losses and inventory acquisitions drained the remainder of the Debtors' working capital in 2017 and 2018. A daily liquidity crisis ensued during most of 2017 and 2018.  The Debtors looked to leverage to provide needed working capital, but the only available debt came from hard money lenders that assessed the Debtors with fees and charged interest rates in excess of 60% per annum, with daily repayments of approximately $6,000 (or up to $120,000 per month) in 2018. Most of the hard money lenders have been repaid at a

6

substantial cost that further constrained inventory purchases beyond just the losses. The Debtors'

liquidity crisis returned during the latter part of 2018 and the beginning of 2019.  Such hard

money loans have been presented to the Debtors by such lenders almost weekly as it has

struggled with liquidity.  However, the Debtors concluded that the hard money loans harm them

more than it helps them and have come to believe that they are better off reorganizing than

taking any additional hard money loans.

24.     The Debtors have analyzed their business carefully and believe that at the

current sales levels, a clean, unlevered balance sheet would allow it to restore growth and

profitability; and a fresh start would enable it to attract sufficient and appropriate permanent

working capital until the new profits are sufficient to sustain the growth of the business that will

ensue.

### PART III

### FIRST DAY MOTIONS AND APPLICATIONS

25.     To enable the Debtors to minimize the adverse effects of the

commencement of the chapter 11 case, the Debtors have requested various types of relief in the

First Day Motions filed simultaneously with this Declaration.  A summary of the relief sought in

each First Day Motion is set forth below.[3]

26.     I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption;

---

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day Motions.

and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

A.    **Debtors' Motion for Interim and Final Orders Authorizing (a) Continued Use of Cash Management System; (b) Maintenance of Existing Bank Accounts; (c) Continued Use of Exiting Business Forms; and (d) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of <u>Administrative Expense Status for Postpetition Intercompany Claims.</u>**

27.    The Debtors seek orders (i) authorizing the Debtors to continue (a) using the Cash Management System and Business Forms (each as defined below), (b) maintaining the Bank Accounts (defined below), and (c) performing Intercompany Transactions (defined below); (ii) waiving certain operating guidelines related to the Bank Accounts (defined below); and (iii) granting administrative expense status for postpetition Intercompany Claims (defined below).

28.    The Debtors' business requires the collection, payment, and transfer of funds through five bank accounts (the "Bank Accounts"), as described in the Motion and in the schedule attached as Exhibit C to the Motion. All of the Bank are located at branches of Wells Fargo, N.A. ("Wells Fargo"). In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "Cash Management System") that utilizes the Bank Accounts. The Debtors designed their Cash Management System efficiently to collect, transfer, and disburse funds generated through the Debtors' operations and accurately to record such collections, transfers, and disbursements as they are made.

29.    Part of the Debtors' Cash Management System requires Debtors to utilize providers of Payment Processing Systems ("PPS").  Debtors utilize the PPS to process its customers' transactions.  For example, when a customer purchases Debtors' Merchandise, an invoice is generated by Debtors' enterprise resource planning (ERP) system, Great Plains.  Great Plains then processes the customer's payment through Nodus Technologies, a payment

8

processing company.  Nodus Technology then transfers the proceeds to First Data Merchant Services whom Debtors use to deposit funds in the Wells Fargo Bank account ending in 5741.

30.     The Cash Management System is a feature of the Debtors' ordinary, usual, and essential business practices. The Cash Management System provides numerous benefits, including the ability to (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds; (b) ensure cash availability and prompt payment of corporate, employee, and vendor related expenses; and (c) reduce administrative costs by facilitating the efficient movement of funds.

31.     In the ordinary course of business, the Debtors use various checks and business forms. To minimize expenses to their estates and avoid unnecessarily confusing their employees, customers, and suppliers, the Debtors believe it is appropriate to continue to use all checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date, and without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.

32.     Prior to the Petition Date, in the ordinary course of their business, the Debtors engaged in intercompany transactions and transfers (the "Intercompany Transactions") among themselves that may result in intercompany receivables and payables (the "Intercompany Claims"). The Debtors maintain strict records of transfers of cash and can ascertain, trace, and account for all such Intercompany Transactions. The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

Active\90725689.v6-3/20/19

33.     If the Intercompany Transactions were discontinued, the Cash
Management System and related administrative controls would be disrupted to the Debtors' and
their estates' detriment. As described in more detail below, discontinuing the Intercompany
Transactions would disrupt the Debtors' business operations, harming their creditors and other
parties in interest. Accordingly, the Debtors seek authority to continue the Intercompany
Transactions, and request, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), that
postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions be
accorded administrative priority.

34.     The continuation of the Intercompany Transactions will not prejudice the
Debtors' estates or their creditors. Furthermore, the Debtors maintain strict records of transfers
of cash and can ascertain, trace and account for all such Intercompany Transactions.
Accordingly, the Debtors believe that continuation of the Intercompany Transactions is in the
best interests of the Debtors' estates and creditors.

35.     The Debtors maintain the integrated Cash Management System in the
ordinary course of their business operations, which allows them to effectively and efficiently
administer their cash and financial affairs.

36.     Any disruption to the Cash Management System would have an immediate
adverse impact on the Debtors' businesses and would impair the Debtors' ability to successfully
administer the Chapter 11 Cases. It would be time-consuming, difficult, and costly for the
Debtors to establish an entirely new system of accounts and a new cash management system. The
delays from revising cash management procedures, redirecting receipts, and implementing new
payment protocols would create unnecessary pressure on the Debtors and their employees while
they work to meet the other administrative obligations imposed by chapter 11. In addition,

Active\90725689.v6-3/20/19

preserving a "business as usual" atmosphere and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' efforts to reorganize.

37.     The Debtors are current on all of their known priority tax obligations (or are seeking permissions to satisfy them) and have systems in place to make sure that these claims are satisfied on a timely basis. Altering the Bank Account structure would interrupt these systems, thereby significantly disrupting the Debtors' business operations and jeopardizing the Debtors' prompt and timely payment of employee-related taxes and other priority tax obligations. The Debtors' systems provide the protections required by the U.S. Trustee guidelines – ensuring payment of taxes-without requiring the creation of new accounts and payment procedures.

38.     The Debtors will maintain records of all transfers within the Cash Management System to the same extent they were recorded by the Debtors before the commencement of the Chapter 11 Cases. As a result, the continued use of the Cash Management System will enable the Debtors to record the transactions occurring within the Cash Management System without interruption for the benefit of all parties in interest.

39.     The Debtors' depository accounts are with a bank that has been approved as a depository for funds of debtors in possession by the United States Trustee for Region 3.

40.     In the ordinary course of business, the Banks and the providers of the PPS Providers charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses, including the Payment Processing Fees (collectively, the "Payment Provider Fees"). The Debtors respectfully request that the Court authorize the Banks and PPS Providers to (a) continue to charge the Debtors the

11

Payment Provider Fees and (b) charge-back returned items to the Bank Accounts in the ordinary course of business, whether such items are dated prior to, on, or subsequent to the Petition Date.

41.     Although the Debtors are requesting the suspension of the requirement that they close all Bank Accounts and open new debtor-in-possession bank accounts, the Debtors may determine, in their business judgment, that opening new bank accounts and/or closing existing Bank Accounts is in the best interests of the estates. Nothing contained herein should prevent the Debtors from opening any additional bank accounts, or closing any existing Bank Accounts, as they may deem necessary and appropriate in their sole discretion; provided that any new domestic account is established at a bank that is insured with the FDIC or the FSLIC and organized under the laws of the United States or any State therein, or, in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the U.S. Trustee's List of Authorized Bank Depositories for the District of Delaware.

42.     The Debtors use numerous Business Forms in the ordinary course of their business. In order to minimize expenses to their estates, the Debtors request authority to continue using their existing prepetition Business Forms without reference to their status as debtors in possession or any other alteration. It is essential that the Debtors be authorized to continue using their existing Business Forms because they routinely deal with a large number of vendors and customers, and changing business forms would impose a substantial burden without corresponding benefit.

43.     Consequently, I believe that maintaining the existing Cash Management System and approval of the Cash Management Motion is not only essential, but is in the best interests of the Debtors' estates, their creditors, and parties in interest

**B.      Motion of Debtors' for Interim and Final Orders (a) Approving the Debtors' Proposed Adequate Assurance of Payment for Further Utility Services, (b)**

Active\90725689.v6-3/20/19

**Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (c) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (d) Granting Related Relief**

44.     The Debtors seek entry of interim and final orders (i) prohibiting utility providers from altering, refusing or discontinuing service to the Debtors, (ii) deeming utility providers adequately assured of future payment, (iii) establishing procedures for determining requests for additional adequate assurance, and (iv) for related relief

45.     In connection with the operations of their businesses, the Debtors historically obtained water, sewer service, electricity, waste disposal, telecommunications and other similar services In connection with the operations of their businesses, the Debtors historically obtained water, sewer service, electricity, waste disposal, telecommunications and other similar services from a number of utility providers.

46.     The services provided by the Utility Providers are vital to the ongoing operations of the Debtors.  The Debtors' operations require electricity, telecommunications, internet, water, waste management, and other utility services to operate.  If the Utility Providers are permitted to terminate services, the Debtors' operations will be irreparably harmed and the ability to reorganize will be severely compromised.  Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

47.     Debtors intend to pay all postpetition obligations to the Utility Providers in the ordinary course of their business.  Debtors assert that the cash held by the Debtors will provide sufficient liquidity to pay their obligations to the Utility Providers.

48.     To provide additional assurance of future payment, the Debtors propose to deposit in a segregated account an amount equal to **one half** of Debtors' estimated cost of monthly utility consumption for each Utility Provider (the "Utility Deposits").  The aggregate amount of the proposed Utility Deposits is $3,650.00.  The Debtors propose that the Utility

13

Deposits be made within ten days after the entry of an order granting this Motion.  The Utility Deposits will be held in a segregated account at Wells Fargo Bank, N.A. for the duration of these chapter 11 cases and for the benefit of the Utility Providers to only be applied to any postpetition payment defaults to the Utility Providers by the Debtors.

49.	The Debtors submit that the Utility Deposits, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business, constitute adequate assurance of payment for each of the Utility Providers.  Nonetheless, in the event that certain of the Utility Providers seek additional adequate assurance, the Debtors' request the Court to approve the Procedures for permitting additional adequate protection as set forth in the Motion.

50.	Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party-in-interest and, in fact, only benefits the Debtors' estates and their creditors.  Accordingly, I submit that the proposed adequate assurance is sufficient and that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and parties-in-interest.

**C.	Motion of Debtors Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for Interim and Final Orders Authorizing Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees**

51.	The Debtors seek entry of an order authorizing, but not directing, the Debtors negotiate, remit, and pay any Sales and Use Taxes, Franchise Taxes, Personal Property Taxes, Excise Taxes and Business Fees in the ordinary course of the Debtors' business, including, without limitation, Sales and Use Taxes subsequently determined on audit to be owed for periods prior to the Petition Date, and authorizing banks and financial institutions to honor and process checks and transfers related thereto.

14

52.    The Debtors further seek authority to remit Prepetition Tax Obligations in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared[4] and amounts that may be subsequently determined on sales tax audit or adjustment to be owed a particular Taxing Authority or party who ordinarily collects the Prepetition Tax Obligations) not to exceed $59,000.00, without prejudice to the Debtors' rights to contest the amounts of any Prepetition Tax Obligations on any grounds they deem appropriate.

53.    The Debtors estimate that, as of the Petition Date, they owe the approximate amount in Prepetition Tax Obligations:

| Type of Tax | Prepetition Amount |
|---|---|
| Sales & Use Tax | $227,000.00 |
| Franchise Tax | $0.00 |
| Personal Property Tax | $0.00 |
| Business Licenses, Permits & Other Fees | $0.00 |
| **Total** | $227,000.00 |

54.    Various state and local laws may require Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local, state, and federal regulatory agencies.  To the extent there are prepetition amounts outstanding with respect to these taxes and fees, Debtor requests the authority to pay such amounts.

55.    Accordingly, I believe payment of the Prepetition Tax Obligations is in the best interest of the Debtors' estates and therefore request that the motion be granted.

**D.    Motion of the DebtorsPursuant to 11 U.S.C §§ 105(a), 363 and 507(a) for an Order (a) Authorizing the Debtors to (i) Pay Wages, Salaries, and Other Compensation, and (ii) Maintain Benefits, and (iii) Pay Reimbursable Employee Expenses and (b) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Mad by the Debtors Relating to the <u>Foregoing</u>**

---

[4] The Debtors request authority to reissue any amounts paid by check prepetition that have not cleared as of the Petition Date and are dishonored.

Active\90725689.v6-3/20/19

56.     The Debtors request, in their sole discretion, the authority (i) pay unpaid prepetition claims for wages salaries, and commissions to the Employees (the "Unpaid Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits offered by the Debtors (the "Benefits"); (iv) reimburse certain unpaid business expenses incurred prepetition by the Workforce; and (v) pay all costs incident to the foregoing as set forth in detail below.

57.     As of the Petition Date, the Debtors employ approximately 25 persons (the "Employees") as of the Petition Date. The Employees are employed through the PEO (as defined below).  The Employees are not unionized. The Salaried Employees and Hourly Employees are employed through ADP, acting as a PEO.

58.     The Debtors' Employees are paid in arrears. Salaried Employees and Hourly Employees are each paid bi-weekly (each, a "Bi-weekly Pay Date"). The next Bi-weekly Pay Date will be on March 29, 2019.

59.     Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business may sometimes modify, change and discontinue employee programs and implement new employee programs, and will continue to do so during this chapter 11 case. The Debtors will provide notice thereof as required by applicable rules and law, if any.

60.     The Debtors retain ADP TotalSource, Inc. ("ADP") as co-employer of its Employees through a Professional Employer Organization (the (PEO"), to administer its payroll for Employees. ADP, through the PEO, handles the human resources management and benefits administration function and issues payroll checks and direct deposits to its Employees on a bi-weekly basis. The Debtors are responsible for certain contributions respecting benefits for the Employees.

16

61.     The Debtors' recent aggregate monthly payroll, excluding overtime, commissions and benefits, was approximately $160,000 per month.

62.     While the Debtors do not believe that as of the Petition Date any amounts on account of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"), the Debtors nonetheless request authority to pay any Employer Tax Obligations that accrued prior to the Petition Date, including but not limited to those that are subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

63.     The Debtors seeks authority to pay the Unpaid Wages and any outstanding Employer Tax Obligations in its ordinary course operations.

64.     Under the laws of the states in which the Debtors operate, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Policy") with the PEO through which the Debtors receive workers' compensation insurance coverage.

65.     The Debtors submit that the continuance of its Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seeks authority to maintain its workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to the insurance carrier as they come due in the ordinary course of business for going forward coverage.

66.     It is the Debtors' policy to reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors (the "General

Reimbursement Obligations"). Such General Reimbursement Obligations also may include amounts billed by an Employee to corporate charge cards for the purchase of supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.

67.     It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period because the expenses incurred by the Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing.

68.     By this Motion, the Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) up to $25,000 and to continue to honor General Reimbursement Obligations incurred post-petition in the ordinary course of the Debtors' business.

**E.     Motion of Debtors for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Debtors to Pay Prepetition Claims of Shippers and Customs Representatives and Granting Related Relief**

69.     The Debtors seek the authority to continue to pay, in the ordinary course of business certain prepetition claims of the Debtors' shippers (including Freight Forwarders and Common Carriers as defined herein), shipping and delivery logistics agents, customs representatives and warehousemen (the "Shippers and Customs Representatives") who have (or may have) non-bankruptcy law remedies available to secure payment of their claims.  The Debtors propose to pay such claims, when the Debtors, in their sole discretion, determine that such creditors' exercise of their remedies would unduly disrupt the Debtors' business.  The Debtors request the authority, but not the obligation, to pay up to $50,000 on account of such claims (the "Shipping and Custom Charges").  The Debtors also seek authority for all banks and financial institutions to honor any checks or requests for payment related to Shipping and

Customs Charges whether presented prepetition or postpetition.  Finally, the Debtors also seek authority to retain or obtain any Customs Bond needed, in their discretion.

70.    The Debtors source, produce, bottle, and sell high quality boutique wine (the "Merchandise") directly to consumers in the United States through telephonic and electronic commerce sales directly to consumers ("E-commerce Consumers").

71.    The Merchandise is manufactured within the United States and elsewhere. The Debtors' business depends on the daily process of importing and shipping the Merchandise to stock the Debtors' warehouse, and to make direct sales to E-commerce Consumers.  The Merchandise is received into the Debtors' San Diego distribution center (the "Distribution Center") and then shipped from there directly to E-commerce Consumers.  The flow of Merchandise to and from the Debtors is dependent on the services provided by custom brokers, freight forwarders, and common carriers.

72.    *Freight Forwarders*.  The Debtors engage the services of freight forwarders that contract for, coordinate, and ensure the transportation of the Merchandise to and from the Distribution Center.  The Merchandise is manufactured within and outside the United States and must be shipped from the domestic or international manufacturing site to the Distribution Center.  Merchandise shipped internationally is subject to custom import duties upon arrival in the United States.

73.    *Customs Brokers*.  The Debtors rely on Customs Brokers to obtain possession of this Merchandise as it arrives in the United States from abroad and to expeditiously process the release of the Merchandise so it can be delivered to the Distribution Center.

74.    *Common Carriers*.  Merchandise at the Distribution Center is intended for sales through the Retail Stores, Wholesale Customers and E-commerce Consumers.  After the

19

Merchandise is brought to the Distribution Center by the Freight Forwarders, the Debtors then engage the services of certain Common Carriers to expedite shipment of Merchandise from the Distribution Center to the Retail Stores, Wholesale Customers and E-Commerce Consumers.

75.     The estimated retail value of the Merchandise being transported and/or processed as of the Petition Date by the Shippers and Customs Representatives substantially outweighs the outstanding Shipping and Custom Charges.  The Debtors' ability to pay the Shippers and Customs Representatives that are involved in the daily transportation of the Merchandise to the Distribution Center and then from the Distribution Center to the E-commerce Consumers is critically important to the Debtors' business operations.

76.     The Debtors owe the Shippers and Customs Representatives approximately $50,000 for prepetition shipping, custom duties, and similar charges.  In the event that such charges remain unpaid, the Shippers and Customs Representatives likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are paid and their liens satisfied.

77.     As noted above, the value of the Merchandise that is in transit with the Shippers and Customs Representatives substantially outweighs the Shipping and Custom Charges. The Debtors anticipate that the Shippers and Customs Representatives will demand immediate payment from the Debtors.  Even absent a valid lien, the Shippers and Customs Representatives' mere possession (and retention) of the Debtors' Merchandise could severely disrupt the Debtors' operations and restructuring efforts.

78.     Accordingly, I believe that the total proposed amount to be paid to the Shippers and Customs Representatives is justified and reasonable compared to the importance and necessity of the Shippers and Customs Representatives' releasing the merchandise worth

20

tens of millions of dollars and delivery of same and the losses the Debtors may suffer if their operations and the administration of their estates are disrupted.  Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers and Customs Representatives that are to be paid pursuant to this Motion.

79.    *Customs Bond*.  The Debtors have a Customs Bond in place to provide assurance of payment of United States Customs ("U.S. Customs") duties upon importation of goods into the United States.  The Debtors do not anticipate any change in the existing Customs Bond and intend to keep the Customs Bond in place and renew or obtain any customs bond which may be needed going forward in the ordinary course of their businesses.  Should the Customs Bond expire or otherwise be unavailable, clearance of certain Merchandise through U.S. Customs would be delayed or blocked which would be detrimental to the Debtors' business. Maintenance of any appropriate or required Customs Bond will ensure proper clearance of the Debtors' merchandise and avoid disruption in the Debtors' business.

**F.    Motion of Debtors for Entry of an Order (a) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and (b) Granting Related Relief**

80.    The Debtors seek the entry of an order, (i) authorizing to pay the liquidated, non-contingent, and undisputed prepetition claims of vendors and service providers (the "Prepetition Vendor Claims") in the ordinary course of business under the terms and conditions set forth in the Motion.

81.    In the ordinary course of their business, the Debtors rely on certain third-party vendors and service providers to supply goods, materials and services that the Debtors cannot operate without or cannot replace without incurring exorbitant costs (collectively, the "Critical Vendors"). The Debtors' business relies on their access to and relationship with a network of vendors and suppliers.  Any disruption in the Debtors' supply of merchandise would

21

have a far-reaching economic and operational impact on their business.  The vast majority of the

Debtors' merchandise is provided by a broad network of vendors that, for the most part, conduct

business with the Debtors on an invoice by invoice or purchase order by purchase order basis,

and not pursuant to long-term contracts.  The Debtors also rely on key service providers.  These

vendors typically supply their customers with services and products on trade terms based on their

experience with and perceived risk of conducting business with such customers.

   82.  The Debtors undertook a process to identify the Critical Vendors using the

following criteria: (i) whether a vendor is a sole-source or primary provider of services or

products; (ii) whether certain customizations, specifications, or volume requirements prevent the

Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable

timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products,

whether the Debtors can continue to operate in the ordinary course while a replacement vendor is

secured. As a result of their critical review and evaluation, the Debtors have identified a narrow

subset of vendors as Critical Vendors.

   83.  The Critical Vendors do not operate under formal contracts with the

Debtors. Instead, the Critical Vendors rely on prompt and full payment.  Absent assurance of

immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods

or services to the Debtors.  The Debtors believe that it would be extremely difficult, if not

impossible, to replace the Critical Vendors within a reasonable time without severe disruption to

the Debtors' business.  Such harm would likely far outweigh the cost of payment of the Critical

Vendor Claims.

   84.  As of the Petition Date, the Debtors will owe amounts to certain Critical

Vendors (a) that have been billed and invoiced and/or (b) that have accrued immediately prior to

the Petition Date for which they have not yet been invoiced or payment is not yet due. The

Debtors anticipate the total amount of Critical Vendor Claims will be approximately $15,000.

85.     Given the importance of the goods or services provided by the Critical

Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and

authority to satisfy the prepetition claims of the Critical Vendors as any disruption in the

Debtors' ability to adequately stock their retail stores and provide merchandise directly to their

customers would cause immediate and irreparable damage to the Debtors' business.

86.     Subject to the Court's approval, the Debtors intend to pay the Critical

Vendor Claims only to the extent necessary to preserve its business as a going concern. To that

end, in return for paying the Critical Vendors Claims, the Debtors propose that they be

authorized to require that the Critical Vendors provide favorable trade terms for the postpetition

delivery of goods and services. Specifically, the Debtors propose to condition the payment of

the Critical Vendor Claims upon the Critical Vendors' agreement to continue—or

recommence—supplying goods and services to the Debtors in accordance with trade terms at

least as favorable as those practices and programs (including credit limits, pricing, timing of

payments, availability, and other terms) in place 12 months prior to the Petition Date, or such

other trade terms that are acceptable to the Debtors in their discretion (the "Customary Trade

Terms").

87.     In addition, the Debtors request that, if the Critical Vendors accept

payment pursuant to the relief requested by this Motion and thereafter do not continue to provide

goods or services on Customary Trade Terms, then: (a) the Debtors may then take any and all

appropriate steps to cause such Critical Vendors to repay payments made to it on account of its

prepetition claim to the extent that such payments exceed the postpetition amounts then owing to

such Critical Vendors; (b) upon recovery by the Debtors, any prepetition claim of such party

shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding

postpetition balance due from the Debtors to such party, the Debtors may elect to re-characterize

and apply any payment made pursuant to the relief requested by the Motion to such outstanding

postpetition balance and such supplier or vendor will be required to repay to the Debtors such

paid amounts that exceed the postpetition obligations then outstanding without the right of any

setoffs, claims, provisions for payment of any claims, or otherwise.

**G.      Motion of Debtors for Order under Sections 105 and 363 of the Bankruptcy Code
          and Federal Rule of Bankruptcy Procedure 6003 (a) Authorizing the Debtors to
          Maintain and Renew Existing Insurance Policies and (b) Authorizing Financial
          <u>Institutions to Honor All Obligations Related Thereto.</u>**

88.      In the ordinary course of the Debtors' business, the Debtors maintain

numerous insurance policies providing coverage for, inter alia, commercial general liability,

umbrella liability, shipping and cargo, cyber liability, property, foreign liability and fiduciary

liability, (collectively, the "<u>Policies</u>").  These Policies are written through one entity, Malloy

Imrie and Vasconi Insurance Services, LLC and have historically, cost the Debtors

approximately $100,000 to maintain.

89.      The Debtors seek entry of an order (i) authorizing the Debtors to (a)

maintain and renew existing insurance policies and pay all policy premiums and brokers' fees

arising thereunder or in connection therewith and (ii) authorizing financial institutions to honor

all obligations related thereto.

90.      Debtors' annual premium for its cyber security policy is due March 22,

2019 in the amount of $6,339.00.  Debtors' crime policy renews on April 19, 2019, and their

remaining polices renew on June 11, 2019.  As detailed in the Hopkins Declaration, much of the

24

Debtors' sales are generated via e-commerce therefore, maintaining its Cyber Security policy is integral to its ongoing business and warrant the relief requested herein.

91.     These Policies are essential to the preservation of the Debtors' business, and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.

92.     Accordingly, I believe that it is in the best interests of the estates for the Debtors to continue to pay the amounts due under the Policies and the PFA regardless of whether a given payment became due prior to or after the Petition Date.

**H.     Debtors' Motion for Joint Administration of Their Related Chapter 11 Cases.**

93.     With three affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.  Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk with the volume of paper.

94.     The Debtors have requested that the Court jointly administer these cases, for procedural purposes, only because (a) the Debtors' financial affairs and business operations are closely related and (b) such administration will ease the administrative burden on the Court and other parties.  With respect to the proximity of relations, the Debtors are under common ownership and management.  They also share many creditors and parties in interest.  As a result, joint administration will prevent duplicative efforts and unnecessary expenses, without any risk of prejudice.

95.     Joint administration will permit the Clerk to use a single general docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.  Joint administration also will protect parties in interest by

ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.  Accordingly, I believe that joint administration of the Debtors cases is in the best interest of the Debtors, their estates and creditors.

## I.      Application for Order Appoint Stretto as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date

96.      The Debtors seek to retain the services of Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto"), pursuant to the terms of the Engagement Agreement, as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk"), *nunc pro tunc* to the Petition Date.

97.      Prior to the Petition Date, the Debtors provided Stretto a retainer in the amount of $5,000. Stretto seeks to first apply the retainer to all pre-petition invoices, and thereafter, to have the retainer replenished to the original retainer amount, and thereafter to hold the retainer under the Services Agreement during these chapter 11 cases as security for the payment of fees and expenses incurred under the Services Agreement.  Part of the overall compensation payable to Stretto under the terms of the Services Agreement, the Debtors have agreed to certain indemnification and contribution obligations as set forth in the Services Agreement, to the extent permitted by applicable law and as modified by the Court.

98.      I understand that Stretto hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of this Court for all services performed and expenses incurred after the Petition Date.  Accordingly, I believe that it is in the best interest of the Debtors, their estates and creditors to employ Stretto as the Debtors' claims and noticing agent.

Active\90725689.v6-3/20/19

**J.      Motion of the Debtors for Entry of an Order Authorizing Debtors to File Under Seal Portions of Its Creditor Matrix Containing Certain Individual Creditor Information**

99.      The Debtors seek entry of an order (a) authorizing the Debtors to file a redacted version of the creditor matrix, (b) authorizing the Debtors to file under seal an unredacted version of the creditor matrix, and (c) granting such other and further relief as the Court deems just and proper.

100.     I believe that the Debtors should to redact the address information of individual creditors — many of whom are the Debtors' employees — from the creditor matrix because such information could be used to perpetrate identity theft.

**K.      Conclusion**

101.     For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

*[remainder of page intentionally left blank]*

Active\90725689.v6-3/20/19

Pursuant to 28 U.S.C. § 1746, 1 declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 20 , 2019

Fonda Hopkins
President and Chief Executive Officer

28